**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 23-1201**

MARSHALL TODMAN; TIFFANY TODMAN

        Plaintiffs - Appellees

v.

THE MAYOR AND CITY COUNCIL OF BALTIMORE

        Defendant - Appellant

-------------------------------

MARYLAND MULTI-HOUSING ASSOCIATION, INC.

        Amicus Supporting Appellant

and

PUBLIC JUSTICE CENTER; CIVIL JUSTICE; HOMELESS PERSONS
REPRESENTATION PROJECT; MARYLAND LEGAL AID

        Amici Supporting Appellees.

**No. 23-1277**

MARSHALL TODMAN; TIFFANY TODMAN

        Plaintiffs - Appellants

v.

THE MAYOR AND CITY COUNCIL OF BALTIMORE

       Defendant - Appellee

------------------------------

MARYLAND MULTI-HOUSING ASSOCIATION, INC.

       Amicus Supporting Appellee

and

PUBLIC JUSTICE CENTER; CIVIL JUSTICE; HOMELESS PERSONS REPRESENTATION PROJECT; MARYLAND LEGAL AID

       Amici Supporting Appellants.

---

Appeal from the United States District Court for the District of Maryland at Baltimore. Deborah Lynn Boardman, District Judge. (1:19−cv−03296−DLB)

---

Argued: March 22, 2024                       Decided: June 10, 2024

---

Before WILKINSON and THACKER, Circuit Judges, and FLOYD, Senior Circuit Judge.

---

No. 23-1201 affirmed and No. 23-1277 dismissed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Thacker and Judge Floyd joined.

---

**ARGUED:** Michael Patrick Redmond, BALTIMORE CITY LAW DEPARTMENT, Baltimore, Maryland, for Appellant/Cross-Appellee. Conor Brendan O'Croinin, ZUCKERMAN SPAEDER, LLP, Baltimore, Maryland, for Appellees/Cross-Appellants. **ON BRIEF:** Ebony M. Thompson, Acting City Solicitor, Matthew O. Bradford, Chief of Staff, Renita L. Collins, Chief Solicitor, BALTIMORE CITY LAW DEPARTMENT, Baltimore, Maryland, for Appellant/Cross-Appellee. Joseph S. Mack, THE LAW OFFICES OF JOSEPH S. MACK, Baltimore, Maryland, for Appellees/Cross-Appellants. Avery Barton Strachan, Kerri L. Smith, SILVERMAN | THOMPSON | SLUTKIN |

2

WHITE LLC, Baltimore, Maryland, for Amicus Maryland Multi-Housing Association, Inc. Melanie Babb, Murnaghan Appellate Advocacy Fellow, PUBLIC JUSTICE CENTER, Baltimore, Maryland, for Amici The Public Justice Center, Civil Justice, Homeless Persons Representation Project, and Maryland Legal Aid.

---

WILKINSON, Circuit Judge:

When a tenant is evicted in Baltimore, any personal property left in or about the premises is immediately deemed abandoned. *See* Baltimore City Code art. 13 § 8A (the "Abandonment Ordinance"). The landlord then takes ownership of the property and can do anything he likes with it, except dump it on public streets or sidewalks. He can keep it, pawn it, or take it to a landfill. He can even, as in this case, attempt to sell it back to his former tenants.

Here, plaintiffs Marshall and Tiffany Todman lost their belongings by operation of the Abandonment Ordinance when they were evicted earlier than expected. The Todmans sued the Mayor and City Council of Baltimore (collectively, "the City"), alleging (among other things) that the City had deprived them of their personal property without due process in violation of the Fourteenth Amendment and seeking damages under 42 U.S.C. § 1983. The district court agreed and granted summary judgment in favor of the Todmans. The City now appeals that ruling. Because we agree with the district court that the Todmans were owed more process than they received and that the City was responsible for that failure of process, we affirm.

I.

A.

At the heart of this case are the City's choices about the handling of possessions left behind by evicted tenants. Evictees leave things in their former homes for various reasons. Sometimes they leave behind items they no longer want (and truly intend to abandon), making disposal of those items someone else's problem. But other times tenants leave

4

items they have every desire to keep: perhaps they were mistaken about the date of the eviction, or maybe they had yet to find somewhere new to live. Whatever the reason, landlords and officials carrying out evictions are often faced with handling belongings left behind, and they need clear procedures for how to do so.

States across the country manage this process in a variety of ways. Most states require that tenants' belongings be stored (sometimes by the landlord and sometimes by the municipality) for some period after an eviction during which tenants can reclaim them. *See, e.g.*, Idaho Code § 6-316(2) (3 days); Maine Rev. Stat. tit. 14 § 6013(3) (7 days); Ala. Code § 35-9A-423(d) (14 days); W. Va. Code § 55-3A-3(h)(3) (30 days); *see also* Appellee's Response Br. 36 n.4 (collecting statutes). Other states, including Maryland, instruct that a tenant's belongings are to be removed from the premises. *See* Md. Code, Real Prop. § 8-401(f)(1)(i). In practice, such belongings are usually "placed on the street at the risk of the tenant." *State v. Boone*, 284 Md. 1, 7 (1978).

The usual Maryland process, however, was proving untenable in Baltimore. More than seven thousand evictions were being executed there every year, and by 2006 Baltimore's Department of Public Works had three crews devoted to clearing eviction chattels from the streets. Each year, these crews disposed of almost three thousand tons of material. The cleanup effort was costing Baltimore $800,000 per year. But still the crews could not keep up, and residents were complaining that evictees' property was piling up on Baltimore's streets and sidewalks.

In 2007, a member of the Baltimore City Council proposed a bill intended to prevent that property from ending up in public spaces. The original bill proposed that evictees

5

would have three days post-eviction to reclaim any property left in their former homes. If such property was not reclaimed within three days, it would be deemed abandoned and the landlord could dispose of it as he wished, without, of course, dumping it on Baltimore's streets or sidewalks. Evicted tenants were to be notified of their reclamation rights and the possibility of abandonment in two ways: by first-class, certified mail and by posting. The proposed bill was sent for revisions to a working group comprised of various stakeholders. As part of that working group, representatives of landlords' associations (including amicus Maryland Multi-Housing Association) proposed various revisions, many of which were adopted.

The ordinance that came out of the working group (and that was eventually passed into law as the Abandonment Ordinance at issue in this case) differed from the original proposal in two important respects. First, it contained no reclamation period. Instead, tenants' belongings were conclusively deemed abandoned from the very moment of eviction. Baltimore City Code art. 13 § 8A-4. Second, it altered the notice requirements. Given that there was no longer a reclamation period, there was no need to notify evictees of such a right. Instead, the ordinance required the landlord to "notify the tenant of the date on which the warrant of restitution"—in other words, the eviction—"is first scheduled to be executed by the Sheriff." § 8A-2(b). That notice must "prominently warn the tenant that any property left in the leased dwelling will be considered abandoned and may be disposed of." § 8A-2(d)(4).

The complexity of the whole scheme, however, was magnified by the fact that not all groups of evictees were entitled to receive the aforementioned notice of abandonment.

6

Tenants being evicted for failure to pay rent, for example, were treated differently from those who might be paying rent but stayed in the premises beyond the terms of their lease. The former group was entitled to notice upon the receipt of which they might repay due rent, while the latter group (called holdover tenants) was not. *See* § 8A-2(a). Among those not entitled to receive notice were the Todmans, who belonged to that latter group. For them, the ordinance mandated no notice of the potential for or consequences of abandonment at all. All tenants, even holdover tenants, do receive various forms of notice relating to their eviction proceedings under Maryland state law. But neither state law nor the local ordinance in Baltimore requires that they be provided any notice that upon eviction their property would be deemed abandoned and that ownership of that property would pass to the landlord.

B.

The Todmans were holdover tenants, which, recall, is one of the types of tenants not covered by the notice requirements of the City's Abandonment Ordinance. They had been renting part of a house from its owner Brock Collins on a month-to-month basis without a formal lease when Collins first asked them to move out in 2018. He asked them multiple times to leave, but to no avail. By September 2018, Collins was tired of waiting. He served them with a notice to quit tenancy, which under Maryland state law is the first step in the process of evicting a holdover tenant. Still the Todmans remained.

The Todmans' eviction thereafter proceeded in accordance with Maryland law. Their landlord had to wait at least sixty days after serving them with a notice to quit tenancy before he could file a tenant-holding-over action in Maryland state court. *See* Md. Code,

7

Real Prop. § 8-402(c)(2)(i). Collins waited even longer—until May 13, 2019. After Collins filed, the Todmans were served with a notice to appear at a hearing via posting on the leased premises. *See id.* § 8-402(b)(1)(ii).

The tenant-holding-over hearing—attended by Collins and the Todmans—was held on July 2 to determine whether to award Collins a "judgment for restitution of the possession of [the] premises," *see id.* § 8-402(b)(2)(i), which would mean that the Todmans had been ordered to vacate. At the hearing, the Todmans explained to the presiding judge that they wanted to leave and had found another place to live, but that their new place would not be available until August 2. The judge saw an opportunity for compromise, and asked Collins if he would be willing to agree to a stay of the judgment to give the Todmans time to move out.

Collins, however, was wary. In Baltimore City, a judgment of possession in favor of the landlord does not automatically start an eviction. After receiving the judgment a landlord still has to petition for a warrant of restitution. And only after the warrant issues can the sheriff's department schedule an eviction. Collins worried that if the judgment was stayed until August 2, and the Todmans did not move out that day as promised, he would be stuck with them for even longer. He told the judge that, in his experience, it would take the sheriff's department at least two weeks to schedule an eviction after a warrant for restitution had issued. The judge thus proposed a shorter stay of the judgment of possession, explaining:

> [T]he stay of execution [of the judgment of possession] will be until the 16th
> of July at which point it would still take at least two weeks . . . to schedule

8

an eviction. Therefore, you would still have your full month before you would be able to do it.

J.A. 55. Collins agreed, and the Todmans consented to an entry of judgment against them with a stay of the judgment until July 16. Collins told the judge that he would wait to petition for a warrant of restitution until July 17.

Collins, however, petitioned for a warrant of restitution two days earlier, and it issued as soon as the stay was lifted. A copy of the warrant was mailed to the Todmans on July 17. The warrant stated that the Todmans had been ordered evicted and warned "THERE WILL BE NO FURTHER NOTICE." J.A. 727. It did not provide an eviction date. The back of the warrant did, however, contain a section with instructions for tenants and landlords in Baltimore City, which included a bolded warning that "On eviction day any personal property left in or around the rental unit is considered abandoned." J.A. 728.

But the instructions in the warrant of restitution were misleading and confusing at best. The instructions were not clear as to which types of evictions they applied to, and information relevant to the potential for abandonment was buried among so many other items that it almost assured a tenant would overlook or fail to notice it. The instructions started by noting that landlords in a failure-to-pay-rent case (a type of eviction not exempted from the Abandonment Ordinance's notice requirements) "must provide notice to the tenant of the first scheduled eviction date." J.A. 728. Under that were instructions for tenants who wished to challenge whether such notice was properly given and instructions for landlords on proper disposal of abandoned property. Finally, at the bottom of the Baltimore City section, the form warns in bold that "On eviction day any personal

9

property left in or around the rental unit is considered abandoned." J.A. 728. The Todmans maintain that they never saw this notice, but they do not dispute that it was mailed to them by the clerk.

The Todmans' eviction was scheduled more quickly than expected: for July 31, two days before the date they had told the judge they would be out by. As is standard practice, the sheriff's department notified Collins of that date. But the parties dispute whether Collins passed that information on to the Todmans. Collins maintains that he told Mr. Todman the date of the eviction in person while he was mowing the lawn; Mr. Todman denies the conversation took place. Meanwhile, the Todmans continued planning to be moved out by August 2, and Mr. Todman reserved a moving truck for use on August 1.

The eviction happened as scheduled on July 31 while the Todmans were at work. Mrs. Todman's mother was alone at the property when Collins arrived with a sheriff's deputy. The deputy ordered her to leave. On her way out, she was able to grab only her medications, telephone, and phone charger. Collins then took possession of the premises, and everything of the Todmans that remained "in or about" the home (including Mr. Todman's motorcycle on the lawn) was deemed immediately abandoned by operation of the City's Abandonment Ordinance. Collins texted Mr. Todman: "as of this Morning everything in and on the property are my possession per Balt city law." J.A. 390.

According to the Todmans, they were left with only the clothes they had worn to work. The property they lost included clothing, furniture, electronics, kitchenware, and the aforementioned motorcycle, which Mr. Todman asserts was moved the morning of the eviction from the public street to the lawn by Collins so that Collins could claim it as his

10

own. The Todmans also contend that Collins took possession of family photos and the cremated remains of Mrs. Todman's grandfather.

After the eviction, Collins offered to give the Todmans their property back—so long as they paid him $5,800. They were unable to pay, but Collins ended up returning some of their possessions anyway. The parties dispute precisely what property the Todmans were left without after all was said and done. They agree, however, that at least some items were never returned.

## C.

The Todmans sued Collins and the City in federal district court. Collins eventually settled and is no longer a party to the case. As for the City, the Todmans sought damages and declaratory relief under 42 U.S.C. § 1983, alleging that the City's Abandonment Ordinance violated the Takings Clause of the Fifth Amendment and the substantive and procedural due process guarantees of the Fourteenth Amendment. On a motion to dismiss by the City, the district court dismissed the Todmans' takings claim but let their Fourteenth Amendment claims go forward.

After discovery, the Todmans and the City filed cross-motions for summary judgment on whether the Todmans' constitutional rights had been violated. The district court granted the Todmans' motion and denied the City's, finding that the Todmans had suffered a constitutional violation because the Abandonment Ordinance, as applied to them, had violated their right to procedural due process. *See Todman v. Mayor & City Council of Baltimore*, 631 F. Supp. 3d 314, 340 (D. Md. 2022).

11

The district court went beyond just granting the Todmans' motion, though. Section 1983 claims against municipalities require that a plaintiff show not only that his rights were violated, but also that the municipality was responsible for that violation. *See Covenant Media of SC, LLC v. City of North Charleston*, 493 F.3d 421, 436 (4th Cir. 2007). Although the Todmans had "moved for summary judgment only on whether their constitutional rights were violated," the district court found that they were also "entitled to summary judgment on the issue of the City's responsibility for the constitutional violation." *Todman*, 631 F. Supp. 3d at 341 n.14. The City did not object to this *sua sponte* ruling below, and the district court entered judgment against the City and scheduled a trial on damages.

After a three-day damages trial, a federal jury awarded the Todmans $36,000 in compensatory damages and $150,000 for emotional distress. The City has not challenged the amount of that award on appeal.

The City instead appeals the district court's summary judgment rulings. It argues that neither the Abandonment Ordinance nor its application to the Todmans violated due process, and that even if it did that application cannot be laid at the feet of the City. It also contends that the district court erred procedurally when it granted summary judgment on the City's responsibility without allowing the City to brief the issue first. In response, the Todmans filed a conditional cross-appeal, asking that we review the district court's dismissal of the Todmans' takings claim in the event that we found their due process claims lacked merit.

We review a district court's disposition of cross-motions for summary judgment de novo. *Fusaro v. Howard*, 19 F.4th 357, 366 (4th Cir. 2021). For the reasons below, we hold

12

that the City's Abandonment Ordinance violated the Todmans' constitutional rights by depriving them of their property without due process of law and that the City is liable for that violation. We thus affirm the district court's grant of summary judgment in favor of the Todmans. Having affirmed, we need not address the arguments presented in the Todmans' conditional cross-appeal.

## II.

We start with the City's contention that the Todmans' procedural due process rights were not violated at all. Due process is guaranteed by the Fourteenth Amendment, which prohibits the states from "depriv[ing] any person of life, liberty, or property, without due process of law." To establish a procedural due process violation under § 1983, plaintiffs must show (1) that they were deprived of a cognizable liberty or property interest (2) through some form of state action (3) with constitutionally inadequate procedures. *See Iota Xi Chapter of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 145 (4th Cir. 2009).

The Todmans clearly meet the first two requirements. First, they were deprived of a protected property interest. Ownership interests in personal belongings are protected under the Due Process Clause. *Fuentes v. Shevin*, 407 U.S. 67, 89–90 (1972). The Supreme Court of Maryland, previously the Maryland Court of Appeals, has confirmed that Maryland tenants retain those interests through an eviction. *See Nickens v. Mount Vernon Realty Grp., LLC*, 429 Md. 53, 78–79 (2012), *other holdings overturned by legislative action*. And no one contests that, at the moment their eviction was carried out, the Todmans lost all ownership rights to their property. Hence they were deprived of a protected interest.

13

Second, the City's Abandonment Ordinance (which is clearly a form of state action) caused that deprivation. To show state action, plaintiffs "must prove both but-for causation and proximate causation—in other words, that the alleged wrongful act(s) caused [their deprivation] and the [deprivation] was a reasonably foreseeable result of the act." *Gilliam v. Sealey*, 932 F.3d 216, 238 (4th Cir. 2019). The City concedes that its Abandonment Ordinance was a but-for cause of the Todmans' deprivation. Appellant's Reply Br. 29. And the Todmans' loss was surely a "reasonably foreseeable result" of the ordinance—it was, in fact, precisely the result intended. The Todmans have thus met their burden here as well.

We thus conclude that the Todmans were deprived of a cognizable property interest by state action—namely, the operation of the City's Abandonment Ordinance. The first two requirements having been met, we turn to the third: whether the procedures provided here were constitutionally adequate.

"The essence of due process is the requirement that 'a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it.'" *Mathews v. Eldridge,* 424 U.S. 319, 348 (1976) (*quoting Joint Anti-Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 171–72 (1951) (Frankfurter, J., concurring)). The twin requirements of notice and opportunity to be heard are distinct and "governed by different standards." *Snider Int'l Corp. v. Town of Forest Heights, Md.*, 739 F.3d 140, 146 (4th Cir. 2014). The Todmans, however, received neither.

A.

Start with notice. Notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them

14

an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). The means employed to send that notice must "be such as one desirous of actually informing the [interested party] might reasonably adopt to accomplish it." *Id.* at 315. The notice itself must also be "reasonably calculated to convey information concerning [the] deprivation." *Snider Int'l*, 739 F.3d at 146.

Here, the Todmans needed to be notified of the threat of abandonment should their personal possessions be left in the leased premises at eviction. None of the pre-hearing notices given to the Todmans as part of the state-law eviction procedures even mentioned the possibility of personal-property abandonment. So those cannot possibly have provided sufficient notice.

The only notice that could even be said to have attempted to inform the Todmans of the possibility of abandonment was the copy of the warrant of restitution in their case sent to them by mail on July 17. But this notice was not sufficient either. While delivery by mail is a constitutionally sufficient method of providing notice, *see Snider Int'l*, 739 F.3d at 146, the content of the notice mailed to the Todmans was not reasonably calculated to convey the relevant information.

The warning about the potential for abandonment in the warrant of restitution was found in small print two-thirds of the way down the back of the form. Moreover, the form did not make clear that the risk of abandonment applied to holdover tenants like the Todmans. The paragraph that warned of the threat of abandonment came after several paragraphs of information explicitly directed at failure-to-pay-rent tenants. A reasonable person reading the form could interpret the abandonment warning as applying only to

15

failure-to-pay-rent tenants, not to holdover tenants such as the Todmans. Moreover, persons facing eviction could fairly assume that if they were at risk of the deprivation of all their belongings they would have been notified in a more fulsome and less obscure way.

The Todmans were not lawyers, and even an attorney might find it time-consuming to wade through the many provisions of the warrant of restitution before coming to the arguably inapplicable section on abandonment. First, the Todmans would have had to read the small print in a box on the front of the warrant partially obstructed by the seal of the court that instructed: "See the notice on the back of this form for the special procedures in Baltimore City." J.A. 727. They would then have needed to turn to the back of the form and find the section entitled "Baltimore City Only: Important Notice to Defendants." That section began: "The landlord in a *failure to pay rent case* must provide notice to the tenant of the first scheduled eviction date." J.A. 728 (emphasis added). The Todmans would need to recognize that this instruction did not apply to them, but continue reading anyway. The next paragraph contained instructions for how tenants could challenge whether the notices due to them were properly given. Given that the Todmans were not entitled to notice, this paragraph wouldn't apply to them either. But the paragraph did not make that clear. In fact, it didn't make any mention of the types of evictions it did or did not apply to. Instead, the instructions relied on readers like the Todmans to infer that the previous paragraph's limitation to failure-to-pay-rent cases carried forward. So far the Todmans would have perused two paragraphs, neither of which applied to them. And were they to continue reading, they would have found that the third paragraph was likewise inapplicable. It contained instructions not for tenants, but for landlords on how to dispose of "abandoned

16

property." J.A. 728. The Todmans, of course, would have recognized that they were not landlords at all. But even though the warrant had moved on from instructions for tenants to instructions for landlords, the Todmans would have had to have kept reading. If they did read on, the very last paragraph of the Baltimore City section stated in bold: "On eviction day any personal property left in or around the rental unit is considered abandoned." J.A. 728. But even if the Todmans got there, they would likely be left with some uncertainty because this paragraph likewise failed to clarify which evictions it applied to. Did it apply (as the only other paragraphs in the section directed at tenants did) only to tenants in failure-to-pay-rent cases? Or did it apply to everyone?

The notice in the warrant of restitution seemed more likely to impede the Todmans' understanding of their predicament than to fairly inform them of it. It was certainly not "reasonably calculated to convey" the information the Todmans needed in order to avoid the deprivation that awaited them. *Snider Int'l*, 739 F.3d at 146.

The City points out that the warrant of restitution is a form created by the Maryland judiciary, and that the City has no control over its content. But if the state judiciary is not providing sufficient notice of the City's ordinance, the City must step in to provide that notice if it wants its ordinance to survive a due process challenge. As mentioned above, the Abandonment Ordinance includes just such additional notice requirements for other types of evictions. The City retorts that it is prohibited from requiring additional notice in holdover cases by Maryland law, which says that after satisfying the steps laid out by state law, landlords are entitled to an eviction order "without any additional notice." Md. Code, Pub. Local Laws, art. 4 § 9-19. But that law says they are entitled to an *eviction order*, not

17

to their tenants' belongings. The City could still (consistent with state law) condition the triggering of the Abandonment Ordinance on the landlord's providing additional notice. Or it could undertake to provide such notice itself. What it cannot do is evade the requirements of the Due Process Clause by throwing up its hands and saying, "We don't make the notice form."

Respecting one of the Constitution's most basic guarantees should be simple and straightforward. The notice due plaintiffs such as the Todmans should include the date of the eviction and the threat and consequences of abandonment. Critically, the notice should be readily accessible and easily understood and should be of a form that drafters of the ordinance would appreciate if their own property were at risk. The notice here was not sufficient.

## B.

Compounding the lack of sufficient notice was the absence of any method by which the Todmans could contest the deprivation. As mentioned above, due process requires that a person at risk of deprivation receive a meaningful opportunity to be heard before that deprivation becomes final. An "opportunity to be heard" need not always be a full evidentiary hearing. *See Mathews*, 424 U.S. at 333–35. Meaningful opportunities to contest a deprivation can take many different forms depending on what "the particular situation demands." *Id.* at 334. To determine whether a challenged process is meaningful in light of the deprivation at issue, courts look to the three-factor balancing test articulated in *Mathews v. Eldridge*, 424 U.S. 319 (1976). Application of the three *Mathews* factors here makes

18

clear that the Todmans were entitled to more process than the City provided before their personal property rights were extinguished.

1.

The first *Mathews* factor is "the private interest . . . affected by the official action." 424 U.S. at 335. The private interest at stake here is substantial. Evictees in Baltimore face the potential loss of any personal belongings left in or about the leased premises.

"[H]ousehold goods" like the ones the Todmans lost are an "important interest" and merit the protection of procedural due process. *Fuentes*, 407 U.S. at 89. "It is, after all, such consumer goods that people work and earn a livelihood in order to acquire." *Id.* And Baltimore evictees stand to lose not only valuable goods like electronics, furniture, dishes, and clothing, but irreplaceable personal items such as photographs, mementos, and cremated remains. *See* Br. of the Public Justice Center, et al. as *Amici Curiae* 17 (describing a client who had lost a pet and family photographs and two others who had lost ashes of their deceased relatives).

People being evicted are also likely to be facing wider financial distress, and the belongings at risk of deprivation might constitute the only property that they have. The loss of that property might be quite painful indeed. As amicus notes, "[p]roperty rights become dearer, not less important, for people who possess comparatively little." *Id.* at 5. The nature of the rights at issue here thus weighs in favor of meaningful procedural protections designed to ensure that evictees' possessions are not wrongly deemed abandoned.

2.

19

The second *Mathews* factor is "the risk of an erroneous deprivation of [the private] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." 424 U.S. at 335. Here, the risk of erroneous deprivation was significant and additional safeguards would have mitigated that risk. To begin with, there was no post-deprivation mechanism at all by which the Todmans could reclaim or assert possession of their property and rebut the inference that they wanted to give that property up.[1] This lack of process created an unacceptable risk that evictees would be deprived of property they had every intention to keep. The risk of error is exacerbated by the lack of adequate notice described above: Evictees who have not been clearly notified

---

[1] The City contends that tenants like the Todmans are not left without post-deprivation remedies. It advises that dispossessed tenants can seek recourse via any legal or equitable remedies offered under Maryland law. According to the City, those remedies should suffice under *Culley v. Marshall*, 114 S. Ct. 1142 (2024), as a post-deprivation hearing that would alleviate the need for any prior notice or preliminary hearing at all. In *Culley*, the Court considered the appropriate timing of hearings governing civil forfeiture. Property is subjected to such forfeiture only if used in connection with a crime, and police often seize the property at the moment the crime is discovered without notice or a pre-seizure hearing. But criminal accoutrements are a far cry from household belongings to which no crime has been attached. And *Culley* made clear that even owners of property seized for civil forfeiture are entitled to a timely forfeiture hearing before their property is deemed forfeited. *See id.* at 1150.

Here there was no such hearing before the Todmans' property was deemed abandoned. None of the rudiments of due process, including proper notice, was ever provided them. And it is not enough for the City to gesture to the availability of general state procedures for conversion or breach of contract. We cannot see how those causes of action could provide the Todmans with relief from the unrebuttable presumption of abandonment that attached to their property by operation of the Abandonment Ordinance. It is that decree to which the Todmans were denied the opportunity to be heard. And we cannot believe that the Supreme Court would place its imprimatur on anything like the complete absence of process presented here.

of the abandonment risk facing them do not even know to take pre-deprivation precautions. For them, a post-deprivation remedy is even more important.

Given the absence here of any opportunity at all to contest the abandonment, additional safeguards would be quite valuable. Even a short post-deprivation reclamation period could decrease the risk of error significantly. Take as an example the precise situation of the Todmans. They had boxed up all their belongings and intended to move them to their new home. They had even hired a moving truck, slated to come the very next day. Had the Abandonment Ordinance provided for any reclamation period at all—even one as short as a few hours—they would have been able to retrieve their belongings.

In short, the risk of error is not slight, and additional procedural safeguards would be likely to help.

3.

The third *Mathews* factor is "the Government's interest, including the . . . fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335. The City's interest here is in avoiding eviction chattels cluttering Baltimore's streets (and saving the money Baltimore was previously spending on disposing of such clutter). Many Baltimore citizens have written to the City in support of that interest, *see* J.A. 287–93, and we agree that the City's goal here is a laudable one. The neighborhoods in which eviction chattels are most often left on the street may be the ones least able to withstand the decline in civic morale that accompanies visible blight. Even so, the City's goal here would not be impaired by clear notice of the date of eviction and the

21

prospect of deprivation or by an opportunity for tenants to contest the presumption of abandonment and secure a brief window in which to reclaim their property.

The City has not suggested to us any way in which its interest in keeping eviction chattels off the streets would be harmed by these additional procedures. It resorted instead to a shell game. Rather than arguing that it was without mitigating options, it claimed that it was prohibited from undertaking such procedures by Maryland state law, which states that a warrant of restitution should "command[] the tenant . . . *forthwith* to deliver to the landlord possession [of the premises] in as full and ample manner as the landlord was possessed of the same at the time when the tenancy was made." Md. Code, Real Prop. § 8-402(b)(2)(i) (emphasis added). According to the City, the word "forthwith" prohibited it from offering any sort of post-eviction reclamation period during which the premises would remain encumbered by the former tenant's belongings. But it is not clear that "forthwith" means in this context "without any delay at all." Even without a reclamation period, the sheriff does not immediately execute the warrant of restitution. As Collins noted during the eviction hearing, it often takes at least two weeks.

The presence of notice and a short reclamation period would not mean more property would end up on the streets. It would not mean that parties should be permitted to dispose of items in such a congestive fashion. In fact, giving notice of the date of eviction and the threat and consequences of abandonment might well encourage tenants to take pre-eviction measures to safeguard their property.

There are any number of ways, including those adopted by other jurisdictions, *see* section I.A *supra*, for the City to achieve its undeniably legitimate aims without

22

extinguishing evicted tenants' entire property rights with no semblance of proper notice or opportunity for reclamation. The three *Mathews* factors weigh in favor of the Todmans and against the current procedural regime. It is not our job to tell the City how to achieve its objectives. The City must, however, achieve its goals in a way that complies with both state *and* federal law—and that includes the due process protections guaranteed in the United States Constitution.

III.

The City says, however, that none of the above really matters because this case is governed by *Texaco, Inc. v. Short*, 454 U.S. 516 (1982). According to the City, *Texaco* provided specific guidance on what process is due before property can be deemed abandoned and is thus the governing standard here. We disagree.

In *Texaco*, the Supreme Court held that Indiana could pass an abandonment statute that allowed the retention of unused mineral rights only on "the performance of reasonable conditions" without incurring a duty to notify potentially affected citizens of that statute beyond the usual publication of the law. *Id.* at 526, 531–33. The City reads *Texaco* to mean that state and local governments can alter the common law standards of abandonment in any way they see fit, and that when they do so they need not provide individuals at risk of abandonment with individual notice or an opportunity to be heard. According to the City, notice of the potential operation of an abandonment statute can instead be accomplished by general publication of the law, and the burden is on potentially affected parties to familiarize themselves with the law and ensure that they do not slip into its reach. The Abandonment Ordinance, the City contends, is just such a statutory modification of the

23

common law of abandonment, with the "reasonable condition" that tenants must remove their property from the premises prior to an eviction in order to keep it.

On this view, the Todmans were responsible for knowing the content of the Abandonment Ordinance and making sure that they complied with its strictures. In short, they need not have received individual notice nor been given any procedural reprieve when, just as the ordinance stipulated, they lost their belongings after failing to remove them.

But *Texaco* does not grant local governments as sweeping an authority over abandonment designations as the City's reading might suggest. The statute at issue in *Texaco* deemed mineral interests abandoned when their owners had taken *no action at all* concerning those interests for a period of *twenty years*. Any action that "ma[d]e any use of the property"—including producing or attempting to produce minerals, paying or receiving rent or royalties, or paying taxes on the interest itself—would reset the twenty-year clock. *Id.* at 518, 530. And even an owner who had made no use of his property could file a written statement of claim in the county recorder's office to prevent his interest from lapsing. *Id.* at 518. Recognizing that states had long had "the power to permit unused or abandoned interests in property to revert to another *after the passage of time*," *id.* at 526 (emphasis added), the Court held that owners of potentially lapsing interests need not be individually notified of the threat of lapse, *id.* at 532.

The Court's focus in *Texaco* on the passage of time is no accident. At common law, abandonment is an individualized inquiry and requires a showing of an intent to abandon. *See United States v. Locke*, 471 U.S. 84, 98 (1985). But individualized inquiries are expensive and time-consuming. To effectuate the smooth transfer of abandoned property

24

so that it can be put back to productive use, states have codified bright-line rules that deem property abandoned after long periods of nonuse. *See Cerajeski v. Zoeller*, 735 F.3d 577, 579 (7th Cir. 2013). In these statutes (which have been upheld as constitutional, *see Texaco*, 454 U.S. at 526–27), nonuse serves as a reasonable proxy for intent to abandon. If an owner has not made any use of an interest in *decades*, it is reasonable to predict he is unlikely to use it in the future and reasonable to require him to take affirmative actions to establish that he intends to keep the interest.

In contrast, when operation of a confiscatory statute is triggered by something other than long periods of nonuse, it starts to look less like abandonment and more like a government-induced forfeiture. In *Tyler v. Hennepin County*, 598 U.S. 631 (2023), the Court rejected another municipality's contention that *Texaco* allowed it to deem a plaintiff's home "abandoned" when she had failed to pay property taxes on it. *Id.* at 646–47. There, the county had argued that "the owner can be considered to have abandoned her property" because she had failed to abide by the "reasonable condition" of paying her taxes. *Id.* at 646. Therefore, according to the county, it need not have returned to her the excess proceeds from a tax sale of her home when the sales price was greater than her tax debt.

The Court was not swayed. "Abandonment," it explained, requires "the owner's failure to make *any* use of the property—and for a lengthy period of time." *Id.* at 647. The forfeiture scheme at issue, by contrast, had no similar time-period requirement and accorded "no weight to the taxpayer's use of the property." *Id.* A home could be deemed abandoned even when the owner had lived in it right up until the moment the government

25

took it. *Id*. The Court thus held that the county could not avoid the strictures of the Takings Clause by naming the confiscation "abandonment." *Id.*

The City's policy here is similarly ineligible for *Texaco* treatment. The conditions that trigger abandonment under the Abandonment Ordinance—like those in *Tyler*—were not well-tailored to evicted tenants' desires to abandon their property. Like the tax debtor in *Tyler*, evictees can continue to use their personal property right up until the moment of eviction, and still the property will be deemed abandoned by operation of the ordinance. And while it is true that some evictees who leave their property on the leased premises really are intending to abandon it, it is much too poor a proxy to operate without individual notice or an opportunity to contest the deprivation. In short, this is not a traditional abandonment law at all.

*Tyler*, of course, was concerned with takings and here we are considering a due process challenge, but the two concepts are intertwined, and we see no reason that the property protections afforded under the Due Process Clause ought not to track the rule laid out in *Tyler*. *See Cerajeski*, 735 F.3d at 582 (commenting that abandonment policies with nonuse requirements shorter than usual could trigger due process rights). Just as "a State may not sidestep the Takings Clause by disavowing traditional property interests long recognized under state law," *Phillips v. Washington Level Found.*, 524 U.S. 156, 167 (1998), so too a municipality may not sidestep the demands of due process by calling property "abandoned" when none of the traditional markers of abandonment are present. Were we to hold otherwise, local governments could opt out of the Due Process Clause altogether by recharacterizing any deprivation as an abandonment. *See Hall v. Meisner*, 51

26

F.4th 185, 190 (6th Cir. 2022) ("[T]he Takings Clause would be a dead letter if a state could simply exclude from its definition of property any interest that the state wished to take."). To repeat, we hold that the Todmans were entitled to individual notice that their property was at risk and procedures by which they could protect their interest. And, as we held above, the notice and process that they received here were constitutionally inadequate.

## IV.

We turn now to the final question: whether the City can be held liable for the due process violation the Todmans suffered. Recall that plaintiffs seeking § 1983 damages from a municipality must show not only that they suffered a constitutional violation, but also that the municipality was *responsible* for the violation and its attendant harm. *See Covenant Media*, 493 F.3d at 436. Local government entities are considered responsible only for unconstitutional actions that "implement[] or execute[] a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 690 (1978). In other words, the City can be held liable only for "action[s] pursuant to official municipal policy of some nature." *Id.* at 691. The City's Abandonment Ordinance is just such an official municipal policy. *See Spell v. McDaniel*, 824 F.2d 1380, 1385 (4th Cir. 1987) ("[M]unicipal 'policy' is found most obviously in municipal ordinances.").

An unconstitutional policy, however, does not immediately entitle a plaintiff to compensation. There must be a "direct causal link" between the municipal policy and the constitutional deprivation. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). Here, the causal link is clear. The Abandonment Ordinance was what gave the Todmans' landlord

27

the right to claim possession of their things with legal impunity. As a self-executing statute, it operated automatically without the interference of any other actors upon the Todmans' eviction.

And the unconstitutional lack of procedure here was no accident. The Abandonment Ordinance was implemented against the Todmans in conformity with the exact procedures the municipality chose. When a municipal policy "directly commands or authorizes constitutional violations, the causal connection between policy and violation is manifest and does not require independent proof." *See Spell*, 824 F.2d at 1387 (internal citation omitted). The Abandonment Ordinance here commanded that the Todmans should forfeit their property with no notice requirement and no reclamation rights. There is thus a direct causal link between the City's policy and the violation of the Todmans' constitutional rights and the City can fairly be held responsible to them for the suffering and loss that resulted.

The City tries to evade that responsibility by insisting that it does not control the eviction process—and therefore should not bear responsibility if the process was administered unconstitutionally. The City is right that evictions are administered by the Maryland state judiciary, but that is of no moment here. The procedures of the eviction process are not being challenged; the procedures surrounding the Abandonment Ordinance are what we have held were insufficient. And the confiscatory aspect of the Abandonment Ordinance is not governed by the state eviction process. State-judiciary-led eviction proceedings do not generally purport to encompass tenants' rights to their personal property or the abandonment of the same. The state judge in the Todmans' eviction

28

proceedings specifically instructed them that she would hear only arguments concerning the judgment of possession of the premises leased from Collins. "[A]ny other issues," she told them, "[a]re not relevant." J.A. 44. In short, the State generally provides procedures related to the disposition of the premises (a disposition that is governed by state law); procedures for carrying out the City's Abandonment Ordinance are left to the City to sort out for itself.

It is true that the state judiciary (and not the City) authored the warrant of restitution that we held above provided insufficient notice. But the failure of process does not become the responsibility of the State just because the State has elected to provide some notice of the City's policy in the course of its administering evictions. When a municipality passes an ordinance purporting to affect the rights of its citizens, the municipality is the entity responsible for making sure that the ordinance does so constitutionally.

Contrary to the City's protestations, this principle is in line with the edicts of *Monell*. *Monell* says that a municipality is not responsible when individuals working on behalf of the municipality commit a constitutional violation in the absence of a municipal policy. *See* 436 U.S. at 691. But each of the actors here—the state judiciary, the sheriff, and Collins—operated within the Abandonment Ordinance's scheme. The City's policy, embodied in its own ordinance, is specifically *not to require notice for holdover tenants* and *not to provide a reclamation period*. It cannot then point the finger elsewhere when notice is not given and reclamation not provided for.

In sum, we think it eminently fair to hold a municipality responsible for harm caused by a failure of due process when it passes a confiscatory ordinance that fails to provide for

29

the process due. We therefore hold that the City is responsible for the Todmans'

constitutional harms and liable to them for their damages under § 1983, and affirm the

district court as to the same.[2]

V.

For the foregoing reasons, the Todmans were denied the process they were due. We

affirm the district court's grant of summary judgment in favor of the Todmans on the City's

liability under § 1983. Having affirmed on the basis of the Todmans' due process

challenge, we need not address the takings issues raised in the Todmans' conditional cross-

appeal and thus dismiss it.

No. 23-1201 <em>AFFIRMED</em>;<br>No. 23-1277 <em>DISMISSED</em>.

---

[2] In affirming on the merits, we reject the City's procedural challenge to the district court's *sua sponte* ruling as well. The district court relied on the City's concession below that, if the district court found the Todmans' rights had been violated, the only issue left for the jury would be damages. *See* J.A. 778. And the City waived any right to object on appeal when it failed to lodge an objection with the district court after the summary judgment ruling. *See* 10A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2720.1 (4th ed.) ("[I]f the parties fail to object to the court's sua sponte entry of summary judgment, they will be found to have waived their objection on appeal.").